**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 5 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

STATE OF COLORADO,

    Plaintiff-Appellant,

v.

SUNOCO, INC.; WASHINGTON
CONTRACTORS GROUP, INC.;
WASHINGTON GROUP INTERNATIONAL,
INC.; DENNIS WASHINGTON,

    Defendants,

and

A.O. SMITH CORPORATION; ASARCO,
INCORPORATED; BECHTEL
CORPORATION,

    Defendants-Appellees.

---

UNITED STATES OF AMERICA,

    Amicus Curiae.

No. 02-1014

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 01-N-1)

---

Alan Gilbert, Solicitor General, (Ken Salazar, Attorney General, and Robert Marsh,
Office of Attorney General, with him on the briefs), Denver, Colorado, for the plaintiff-
appellant.

Steven W. Black, Holland & Hart LLP, Denver, Colorado, for defendant-appellee ASARCO, Inc.; Scott E. Mortman, Mayer, Brown, Rowe & Maw, New York, New York, for defendant-appellee Bechtel Corporation (Jerry N. Jones and Richard S. Vermeire, Moye, Giles, O'Keefe, Vermeire & Gorrell LLP, Denver, Colorado, for defendant-appellee A.O. Smith Corporation; Cassandra Sasso, Baker & Hostetler, Denver, Colorado; Dennis P. Orr, Mayer, Brown, Rowe & Maw, New York, New York, for defendant-appellee Bechtel Corporation, with them on the brief).

James D. Freeman (Thomas L. Sansonett, Assistant Attorney General; John T. Stahr and Mark R. Haag, Department of Justice, Environment & Natural Resources Division; Alan H. Carpian, Office of General Counsel, United States Environmental Protection Agency,, on the brief), Washington, D.C., for the amicus curiae.

---

Before **EBEL**, **BRISCOE**, Circuit Judges, and **SHADUR,** District Judge.[*]

---

**BRISCOE**, Circuit Judge.

---

The State of Colorado (Colorado) appeals from the district court's grant of summary judgment on statute of limitations grounds in favor of defendants A.O. Smith Corporation (Smith), ASARCO, Inc., Bechtel Corporation, and Sunoco, Inc., on Colorado's cost recovery claims under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq*. The district court concluded that Colorado failed to bring its claims within the applicable six-year statute of limitations, 42 U.S.C. § 9613(g)(2)(B). We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse and remand for further proceedings.

---

[*] The Honorable Milton I. Shadur, Senior District Judge, Northern District of Illinois, sitting by designation.

I.

This case concerns the cleanup of the Summitville Mine Site, an abandoned 550-acre gold mine located in the mountains of southern Colorado. For much of its history, the Site was mined using "conventional underground mining techniques." App. at 171. Because "these underground workings had a tendency to fill with groundwater during certain seasons, mine adit facilities [i.e., horizontal openings] were installed to drain the workings." Id. Two of those adit facilities are at issue here. The Reynolds Adit, "driven at one of the lowest topographic elevations" of the Site, "provide[d] one of the highest gradients for groundwater flow" and "has been releasing metal-contaminated, acidic water" into the environment since approximately 1906. Id. At some point in time, a water treatment facility was installed to deal with the contaminated water released by the Reynolds Adit. "The Chandler Adit was also driven to access the workings . . . and was located 2,500 feet west of the Reynolds Adit portal at an elevation of 11,500 feet, 180 feet higher than the Reynolds Adit portal." Id.

During the final years of the Site's operation (1986 to 1992), open-pit, heap leach mining techniques were utilized. With these techniques, gold ore was mined from the mountain, crushed, and heaped in a pile on a specially prepared and lined pad known as a "heap leach pad." Id. at 155. A solution of sodium cyanide was sprayed on and allowed to percolate through the heaped ore to "leach" the gold from the ore. The run-off was pumped from the heap, the gold was recovered, and the solution was renewed and reused

3

on the heap.  The heap leach operations produced a substantial amount of contaminated water (i.e., water contaminated with cyanide and toxic metals).  To address this problem, two water treatment plants were installed: one to deal with the cyanide and the other to deal with the toxic metals.  Apparently, neither plant was completely effective and the treated water could not be released into the environment.

At some point during the heap-leach operations, a leak developed in the liner of the heap leach pad, allowing cyanide solution to leak into the drain system below the pad.  Because the cyanide-contaminated water could not be discharged legally into the environment, the mine operator installed a sump system to pump the contaminated water back to the leach pad.  The large amount of contaminated water pumped by the operator to the heap leach pile, combined with large amounts of snow and rain water, resulted in the pile becoming a huge pond with millions of gallons of cyanide and metal-polluted water.

In early December 1992, the last operator of the mine, Summitville Consolidated Mining Company, Inc. (SCMCI), filed for Chapter 7 bankruptcy.  On December 16, 1992, the State of Colorado and the Environmental Protection Agency (EPA) took control of the Site to prevent a "disastrous release" of contaminated water into the environment due to the likely cessation of water treatment operations by SCMCI.[1]  The EPA's initial response

---

[1] For example, the EPA opined that if the Site had been allowed to be abandoned entirely, contaminated water would have been released "in very significant amounts to Wightman Fork and the Alamosa River," which in turn "would [have] devastated the

4

was aimed primarily at

> maintaining site conditions throughout the winter, including prevention of
> freezing or damage to existing facilities and equipment; preparing for
> spring runoff, including drawing down the level of water in the Heap Leach
> Pad to protect against overtopping during spring runoff; operation of the
> wastewater treatment plants; and improving the quality of water discharged
> from the facilities.

Id. at 226. As part of these initial steps, the EPA increased the efficiency and capacity of

the heap leach pad water treatment systems. On May 31, 1994, the Site was placed on the

National Priorities List (NPL), "a list of the most highly contaminated hazardous waste

sites in the United States." Supp. App. at 252. The EPA since has published four

Focused Feasibility Studies, issued four Interim Records of Decision, conducted a

Sitewide Remedial Investigation and issued a Sitewide Feasibility Study. Actions are

ongoing at the Site, and, according to the governments, the final site-wide remedy is still

in the planning stages and construction is not set to begin on the final remedy until the

summer of 2004.

For purposes of this appeal, only three of the actions at the Site since its takeover

are at issue: (1) the plugging of the Chandler adit; (2) the installation of monitoring wells

in the Reynolds and Chandler adits; and (3) the construction of the sludge disposal area.

*Plugging of the Chandler adit* – As previously noted, contaminated water was

---

Alamosa river water shed with enormous quantities of toxic heavy metals and . . . cyanide
impacting fisheries, wetlands, drinking water wells, irrigated farm lands, [and] connected
watersheds." App. at 157.

flowing out of the underground mine workings through the Reynolds adit. At the time the governments took over the Site, a portable water treatment system was being used to treat a portion of that contaminated water. Initially, the EPA modified the water treatment system to increase its treatment capacity but this action did not totally eliminate the discharge of contaminated water. The EPA concluded there were two basic options for dealing with the problem -- take no action, leaving the portable water system treatment in place, or install a concrete plug in the adit to block the outflow of contaminated water. The EPA concluded the second alternative was preferrable, both from the standpoint of reducing acid mine drainage and from a cost reduction perspective. As part of the process of plugging the Reynolds adit, the EPA decided to simultaneously plug the Chandler adit. Although no contaminated water was being discharged from the Chandler adit, it sat approximately 180 feet above and was hydraulically connected to the Reynolds adit. The EPA was concerned that plugging the Reynolds adit would cause contaminated water in the mine to back up and eventually flow out of the Chandler adit.

Construction of the Reynolds adit plug, consisting of excavating loose rock, drilling numerous radial grout holes, and installing concrete plugs and pipe, began on November 22, 1993, and was completed by January 25, 1994. Construction of the Chandler adit plug began on February 3, 1994, and ended on February 22, 1994. "Once completed, there was an immediate decrease in flow, and an initial 65% decrease in copper loadings from the Site overall." Supp. App. at 261. "Also, copper loadings

6

directly attributable to the Reynolds Adit decreased by 97%." Id. The Chandler adit plug was reinforced in November 1994 after leakage occurred as a result of porous or fractured rock surrounding the plug.

*Monitoring wells for adit plugs* – In order to determine the effects of the adit plugs on the water levels and the formation of contamination inside the mountain, the EPA drilled and installed some groundwater monitoring wells and regularly sampled water from the wells to determine water chemistry and levels. It is uncontroverted that this occurred in 1994.

*Construction of sludge disposal area* – The water treatment operations at the mine produced, as a byproduct, waste treatment sludge. SCMCI had disposed of this sludge on the heap leach pad. Because there was no other suitable repository immediately available, the EPA continued that practice during the early part of the cleanup. The sludge was later removed from the heap leach pad and temporarily placed in another area of the Site. After apparently concluding that water treatment efforts at the Site would need to be continued indefinitely, the EPA studied on-site options for long-term disposal/storage of the sludge. The EPA concluded that a permanent sludge disposal area should be created in the South Pit area of the mine.

There is conflicting evidence in the record concerning when construction of the permanent sludge disposal area began. A report prepared by an outside consulting firm dated April 2, 1999, stated that construction began in July 1994. Other evidence

suggested construction began sometime in 1995. An April 1995 EPA report stated that competitive bidding for construction of the disposal area did not begin until April 5, 1995. Further, an affidavit from an EPA project manager for the Site indicated that construction of the sludge disposal area occurred sometime between July 1995 and July 1996.

*Litigation arising from the cleanup* – Colorado and the United States filed suit in May 1996 under CERCLA against various parties, including Robert M. Friedland, the owner of the parent company of SCMCI, to recover costs associated with the cleanup of the Site. At no time during the pendency of that suit did the governments assert claims against the defendants in the instant action. According to the record, that action was ultimately settled.

On January 2, 2001, Colorado filed this action pursuant to CERCLA §§ 107 and 113, 42 U.S.C. §§ 9607 and 9613, to recover from defendants the response costs incurred and to be incurred at the Site. On April 17, 2001, defendant Smith (a shareholder of SCMCI) moved for summary judgment based upon CERCLA's statute of limitations. In response, Colorado asserted there were genuine issues of material fact concerning whether activities undertaken at the Site constituted removal or remedial actions and when physical on-site construction of a remedial action began at the Site. The district court granted Smith's motion, concluding that Colorado's complaint was untimely. The district court concluded that the governments had initiated physical construction of at

least three remedial actions on the Site prior to January 2, 1995 (six years prior to the filing of the complaint). These three remedial actions included: (1) plugging the Reynolds and Chandler adits; (2) installation of monitoring wells in the Reynolds and Chandler adits; and (3) construction of the sludge disposal area. The district court also *sua sponte* granted summary judgment in favor of the remaining defendants (all of whom had filed motions to dismiss), concluding there was "no dispute of material fact with respect to the statute of limitations issue." App. at 80.

Following the district court's entry of summary judgment, Colorado filed a motion pursuant to Federal Rule of Civil Procedure 59(e) to alter, amend, or reconsider. In support of its motion, Colorado argued, in pertinent part, that a response action reasonably could be separated into "operable units," and that a separate recovery action could be filed for each operable unit. Colorado further asserted there were five operable units at the Site, and that the recovery action was timely with respect to at least two of those operable units. The district court rejected the motion, concluding that "CERCLA's statute of limitations does not apply to individual operable units of a remedial action," and that "plaintiff's argument [wa]s untimely because plaintiff had the opportunity to fully brief this argument in opposition to A.O. Smith's motion for summary judgment and its opposition to defendants' motions to dismiss." Id. at 99.

II.

*CERCLA statutes of limitation for cost recovery actions*

9

Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), sets forth the following

limitations periods for filing suits to recover costs:

> An initial action for recovery of the costs referred to in section 9607 of this title must be commenced--
>> (A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and
>> (B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.
>
> In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

In applying these limitations periods, a court must determine what constitutes a "removal"

or "remedial" action. Section 9601 of CERCLA sets forth the following detailed

definitions of "removal" and "remedial" actions:

> (23) The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessar[ily] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of

10

such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

(24) The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. §§ 9601(23), (24).

In Public Service Company of Colorado v. Gates Rubber Company, 175 F.3d 1177

(10th Cir. 1999), we summarized our understanding of the definitions of "removal" and

11

"remedial" actions:

> Generally, a removal action costs less, takes less time, and is geared to address an immediate release or threat of release. In broad contrast, a remedial action seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health. Remedial actions usually cost more and take longer. Elements of either response action may overlap and semantics often obscure the actual nature of the cleanup performed.

Id. at 1182 (internal citations and footnote omitted).

*Interpretation of statutes of limitation*

Colorado contends the district court erred in interpreting the cost recovery statutes of limitation contained in CERCLA. The district court concluded these statutes of limitation anticipate one removal action and one remedial action per site. Colorado contends, however, that multiple removal or remedial actions can be implemented at a single site, and the cost recovery statutes of limitation in CERCLA were intended by Congress to apply separately to each individual removal and/or remedial action. In other words, Colorado argues, "each separate removal and remedial action is subject to individual application of the cost recovery statutes of limitation." Aplt. Br. at 34. Thus, in Colorado's view, "cost recovery actions can be brought at any time until three years after the completion of all remedial and removal actions." Id. at 40.

Colorado contends its view is supported by the language of and the policies underlying CERCLA. According to Colorado, "[s]eparate application of the cost recovery statutes of limitation" "encourages rapid, proper cleanup because it allows

12

enough time for the government to focus its limited resources properly upon rapid cleanup rather than broad, expensive, complicated litigation against *all* potentially responsible parties," and it "conserves judicial resources by avoiding the need for wholesale, protective, early suits against numerous parties at complex sites." Aplt. Br. at 41-42 (emphasis in original). Finally, Colorado argues that "it encourages at least partial government recovery of its cleanup costs from responsible parties, even if early time periods for recovery expire." Id. at 42.

We note that the issue now asserted by Colorado was not raised in its response to Smith's motion for summary judgment. In that response, Colorado argued only that genuine issues of material fact existed concerning whether the actions at issue were properly classified as "removal" or "remedial" actions. After the district court granted Smith's motion for summary judgment, Colorado filed a motion to alter or amend judgment. For the first time, Colorado argued that the statute of limitations applied separately to the individual removal and remedial actions, or "operable units," of a single response action taken at a particular site. The district court rejected this argument as untimely and on the merits.

Assuming the issue is properly before us, we conclude that Colorado's argument is not supported by the text of § 9613(g)(2). Although both subsections (A) and (B) of § 9613(g)(2) use the indefinite article "a" to modify the phrases "removal action" and "remedial action," they also both use the definite article "the" to modify those same

13

phrases. As asserted by defendants, use of this definite article suggests there will be but a single "removal action" and a single "remedial action" per site. E.g., United States v. Aguilar, 515 U.S. 593, 608 (1995) (Stevens, J., concurring and dissenting) (construing statutory use of definite article "the" in a similar fashion); Freytag v. CIR, 501 U.S. 868, 902 (1991) (Scalia, J., concurring) (same). Perhaps most persuasive is the language in subsection (B) which states that "if *the remedial action* is initiated within 3 years after the completion of *the removal action*, costs incurred in *the removal action* may be recovered in the cost recovery action brought under this subparagraph." (Emphasis added.) In our view, this language indicates there will be but one "removal action" per site or facility, as well as a single "remedial action" per site or facility. If Congress intended to allow multiple actions for separate components of recovery or remedy, it surely would have used the indefinite article "a" rather than the definite article "the" to modify the phrases "removal action" and "remedial action." These same conclusions apply to the last paragraph of § 9613(g)(2), which refers to "the response action" and suggests there will only be one such "response action" per facility or site. Our reading of the statute does not foreclose cost recovery actions that may be filed in some cases many years after the initial limitations period has run. The statute distinguishes between an "initial action" to recover costs and a "subsequent action or actions to recover further response costs." 42 U.S.C. § 9613(g)(2). As long as the EPA or a state files an initial action for cost recovery within the time periods specified in § 9613(g)(2)(A) and (B), subsequent actions may be filed to

14

recover "further response costs at the vessel or facility . . . at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response activity." Id. Therefore, if response activity occurs after the limitations period has run, the cost of that activity may be recovered if an initial cost recovery action for the site was timely filed and the subsequent action is filed no later than three years after cessation of all response activity at the site.

For these reasons, we agree with the district court's interpretation of § 9613(g)(2).[2] We therefore also agree that the key issue in determining the timeliness of Colorado's action is when "physical on-site construction of the [first] remedial action" occurred at the Site. 42 U.S.C. § 9613(g)(2)(B).

*Deference to EPA's characterizations of response actions*

Both Colorado and the United States, appearing as *amicus* in support of Colorado, contend that the district court, in applying CERCLA's statutes of limitation, failed to grant proper deference to the EPA's characterization of the actions at issue. Colorado

---

[2] The United States, appearing as *amicus* in support of Colorado, complains that, under this interpretation of the statute of limitations, the EPA's deadline for filing an initial cost recovery action on the final remedy in this case "would have expired before the agency had even decided whether additional remedial action was necessary." Amicus Br. at 29-30. What the United States fails to mention, however, is that it (a) filed a timely recovery action against other parties involved with the Site, (b) became aware of the defendants in the instant action during the pendency of that action, and (c) intentionally chose not to include them as parties to the initial action. Had the defendants been named as parties in the initial action, there presumably would have been no statute of limitations problem.

15

contends that "the EPA's decisions setting the scope and characterization of removal and remedial actions at the Summitville mine are owed deference" by the courts. Aplt. Br. at 47. In particular, Colorado suggests that deference is appropriate under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). According to Colorado, such deference is owed because "Congress has expressly delegated to [the] EPA the power to choose the particular scope and characterization of removal and remedial actions under CERCLA, and to apply those rules to particular sites." Aplt. Br. at 49. The United States asserts that the district court's "de novo" approach to deciding whether the response actions were remedial in nature was contrary to 42 U.S.C. § 9613(j)(2).[3]

We turn first to the federal government's § 9613(j)(2) argument. Colorado did not assert this argument in the district court, and did not assert reliance on or cite § 9613(j)(2) in its appellate pleadings. We are therefore reluctant to consider it. See Harris v. Owens, 264 F.3d 1282, 1288 n.3 (10th Cir. 2001) ("absent 'exceptional circumstances,' we do not ordinarily consider issues raised only in an amicus brief"). Even if we did consider the § 9613(j)(2) argument, we would reject it. Nothing in § 9613(j)(2) refers to the EPA's

---

[3] 42 U.S.C. § 9613(j)(2), which concerns the "Standard" for "Judicial Review," provides:

> In considering objections raised in any judicial action under this chapter, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.

16

characterization of a particular action, or to the statute of limitations.  Instead, the plain language of § 9613(j)(2) grants deference only to the EPA's "decision in selecting the response action" at issue.  In other words, § 9613(j)(2) is aimed at protecting the EPA's decision to engage in a particular removal or remedial action (e.g., where a defendant in a cost recovery action, in order to avoid liability, challenges a particular recovery action as unwarranted).  Moreover, the United States has cited no case in support of its proposed interpretation of § 9613(j)(2).

We also reject Colorado's assertion that Chevron deference is appropriate here.  None of the statutes or regulations cited by Colorado expressly or implicitly afford deference to the EPA's characterizations in this context.  See United States v. Mead Corp., 533 U.S. 218, 227, 229 (2001) (discussing when Chevron deference is appropriate).  There is no indication that Congress intended for the EPA "to speak with the force of law" in characterizing response actions for purposes of the application of CERCLA's statutes of limitation.  Id. at 229.  Further, we note that the EPA's characterizations of actions in this case, all of which are set forth in agency reports or memos, are not adjudicative rulings, see id., nor are they the result of "a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force," id. at 230.  Rather, those characterizations appear to have been made by the EPA while carrying out its primary responsibility of responding to the environmental threats at the Site.

17

Although we reject the application of Chevron deference in this context, we conclude that deference is owed to the EPA's characterizations under Skidmore v. Swift & Co., 323 U.S. 134 (1944).[4]  Clearly, the EPA has expertise in selecting and executing removal and remedial actions.  Thus, we believe the EPA's characterizations of its actions carry "some weight."  See Skidmore, 323 U.S. at 139-40 (concluding agency's rulings, interpretations, and opinions carried some weight, since they were "made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case"); see also American Petroleum Inst. v. United States Env't Prot. Agency, 216 F.3d 50, 57 (D.C. Cir. 2000) ("Where an industrial by-product may be characterized as discarded or 'in process' material, EPA's choice of characterization is entitled to deference.").  Such deference seems particularly appropriate where an action reasonably can be classified as both "removal" and "remedial" under CERCLA's complex definitional provisions.  As to the precise weight to be given the EPA's characterization of a particular action, we believe that hinges on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it

---

[4]  We note that Colorado did not raise its deference arguments in the district court. Although we typically decline to consider such arguments on appeal, e.g., King v. United States, 301 F.3d 1270, 1274 (10th Cir. 2002), we exercise our discretion to do so here for two related reasons.  First, the arguments are not outcome determinative in this appeal. We would reach the same conclusions even if we granted no deference to the EPA's characterizations.  Second, and most importantly, the deference issue may have some impact on the proceedings on remand.

power to persuade." Skidmore, 323 U.S. at 140.

*Character of the three cleanup actions at issue*

Colorado contends the district court erred in characterizing the three response actions at issue as "remedial" actions under CERCLA (and in turn concluding the initiation of those activities triggered the running of the statute of limitations under § 9613(g)(2)(B)). We agree. For the reasons that follow, we conclude as a matter of law that the plugging of the Chandler adit and installation of the monitoring wells constituted "removal" activities for purposes of CERCLA's statutes of limitation. As for the construction of the sludge disposal area, we conclude the issue was not properly raised by defendant Smith in its summary judgment motion, and that, in any event, genuine issues of material fact exist regarding when that activity occurred.

*Chandler adit plug* – The district court concluded that installation of the Chandler adit plug constituted a "remedial" action because "the Chandler adit was not discharging water before or at the time it was plugged," and thus "was not plugged in response to an actual release [of hazardous waste], or in response to any imminent release, but rather, as part of an overall, long-term solution to contamination at the Summitville Mine site." App. at 75. We reject this conclusion.

It is uncontroverted that the Reynolds adit was discharging water contaminated with toxic metals when the EPA took over the Site. It is further uncontroverted that the water treatment system in place, even as modified by the EPA after takeover, was not

19

sufficient to adequately treat all of the contaminated water emanating from the Reynolds adit. Thus, the EPA concluded it was necessary to take action to prevent the discharge of contaminated water, particularly during the springtime runoff from the mountain. The action selected by the EPA was to plug the Reynolds adit. Because plugging the Reynolds adit created the likelihood of contaminated water discharging from the Chandler adit, the EPA concluded it was necessary to also plug the Chandler adit.

Although the district court was correct in noting that the Chandler adit was not discharging contaminated water at the time it was plugged, that does not necessarily mean it constituted a "remedial" rather than a "removal" action under CERCLA. "Removal" actions are defined under CERCLA to include "actions as may be necessar[ily] taken in the event of the *threat* of release of hazardous substances into the environment." 42 U.S.C. § 9601(23) (emphasis added). Plugging the Chandler adit is easily characterized as such an action since it was taken as a result of the *threat* of release of contaminated water, i.e., the likelihood that contaminated water would discharge from the Chandler adit following the plugging of the Reynolds adit.

At least three other factors support this characterization. First, it is uncontroverted that the EPA did not know precisely how the underground mine workings would react to the plugging of the adits. Although the EPA was fairly certain the plugging would seal the adits and force the contaminated water back into the mountain, it was uncertain whether the plugging would achieve the goal of eliminating treatment of the water.

20

Because of these uncertainties, the EPA installed a pipe and valve in the Reynolds adit plug to allow the EPA to return to the status quo if necessary. Second, as noted by Colorado, "the initial construction of both adit plugs was finished about 14 months after [the] EPA took control of the mine," "a relatively short time frame" "[i]n the context of a clean-up lasting more than a decade in a harsh environment." Aplt. Br. at 53. Finally, it appears uncontroverted that the EPA has consistently characterized the plugging of both the Reynolds and Chandler adits as "removal" actions.

*Adit monitoring wells* – The district court concluded that installation of the adit monitoring wells constituted a "remedial" action under CERCLA. App. at 75. In reaching this conclusion, the district court noted only that "CERCLA expressly includes 'monitoring' within the definition of remedial actions." Id. The district court overlooked the fact that monitoring activities are also expressly included within CERCLA's definition of "removal" actions. In particular, CERCLA defines the terms "remove" or "removal" to include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). As applied here, that clearly includes installation of the adit monitoring wells. Thus, the nature of the activity, i.e., "monitoring," does not necessarily lead to a conclusion that the activity should be characterized as "remedial."

For the reasons discussed above concerning installation of the adit plugs themselves, we believe it is reasonable to characterize the installation of the monitoring

wells as a "removal" action. The wells were installed so that the EPA could determine how the mountain reacted to the plugging of the adits and whether the plugging was effective in reducing the level of contamination in the water. Further, the EPA itself has consistently considered installation of the monitoring wells, like installation of the adit plugs themselves, to be a "removal" action.

*Sludge disposal area* – The third and final activity characterized by the district court as a "remedial" action was construction of an on-site disposal area for sludge created by the wastewater treatment facilities. After examining the record on appeal, we conclude the district court erred in granting summary judgment on the basis of this activity. Although construction of the sludge disposal area was briefly mentioned in the "Statement of Undisputed Material Facts" section of Smith's summary judgment motion, Supp. App. at 231 ("Beginning in July 1994, the EPA began 'construction' of a sludge disposal area."), no further mention was made of the activity in Smith's motion. In the argument section of its motion, Smith asserted "that the State took numerous actions prior to January 2, 1995 which constituted 'remedial action.'" Id. at 240. Although Smith listed nine specific actions it believed were "remedial" in nature, no mention was made of construction of the sludge disposal area. In turn, there was no analysis of this activity in Colorado's response brief or in Smith's reply brief. Thus, we question whether the

activity was legitimately at issue before the district court.[5]

Even assuming the issue was adequately raised, we conclude there are genuine issues of material fact concerning when the activity occurred. Although one document submitted by Smith states that construction of the sludge disposal area began in July 1994, Supp. App. at 290, other evidence submitted by the parties indicates construction did not began until sometime after April 1995, id. at 264 (indicating the sludge disposal area was built during Phase III of the Cropsy Waste Pile project); id. at 322-23 (indicating Phase III of the Cropsy Waste Pile project, including construction of the sludge disposal area, was placed for competitive bid on April 5, 1995); App. at 197 (indicating completion of Phase III of the Cropsy Waste Pile project, including construction of the sludge disposal area, occurred between July 1995 and July 1996). If a finder of fact

---

[5] The importance of argument by the parties on this point cannot be overlooked. On one hand, the activity would appear to fall within the scope of "remedial" actions as defined in CERCLA. "Remedial" actions under CERCLA generally include "those actions consistent with permanent remedy taken instead of or in addition to removal actions." 42 U.S.C. § 9601(24). Further, "remedial" actions include "such actions at the location of the release [of a hazardous substance] as storage [and] confinement." Id. As applied here, that would seemingly include construction of the sludge disposal area, which was intended by the EPA as a permanent storage area for the sludge created by the wastewater treatment activities at the Site. Other factors, however, suggest that the activity reasonably might be classified as part of a broader "removal" action. It is clear from reviewing the record on appeal that this activity was relatively minor in comparison to all of the actions at the Site. The sludge produced by the wastewater treatment efforts at the Site was not one of the environmental hazards that prompted the EPA to take over the Site. The sludge was a byproduct of the EPA's efforts in dealing with the true hazard present at the Site, i.e., contaminated water. Thus, construction of a sludge disposal area arguably could be considered a component of an overall removal action aimed at the primary hazard at issue on the Site.

23

found the latter evidence more persuasive, then characterization of the activity as "removal" or "remedial" would become irrelevant, since in either instance the activity would have occurred within six years of the date this action was filed.

For these reasons, we hold that the district court erred in concluding, as a matter of law, that construction of the sludge disposal area was a "remedial" action that triggered the running of the statute of limitations under § 9613(g)(2)(B).

*Motion to strike portions of the record on appeal*

Appellees have moved to strike portions of Colorado's appendix, as well as exhibits attached to the United States' *amicus* brief. In support of their motion, appellees contend these materials were either not part of the district court record or were submitted to the district court only after its summary judgment ruling and are not properly part of the record on appeal.

To the extent the materials at issue were presented by Colorado to the district court (i.e., the declarations of Angus Campbell and Austin Buckingham, which were included as attachments to Colorado's motion to alter or amend judgment, and the EPA's Interim Final Potentially Responsible Party Search Report, which was submitted by Smith in opposition to the motion to alter or amend), we conclude they are properly before this court. We grant the motion to strike the remaining materials.

Appellees' motion to strike portions of the record on appeal is GRANTED in part and DENIED in part. The judgment of the district court is REVERSED and the case is

REMANDED to the district court for further proceedings consistent with this opinion.